UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

PEDRO ARTEAGA,

                       Plaintiff,                             06 Civ. 1244 (PKC)

          -against-

MICHAEL J. ASTRUE,                          MEMORANDUM
Commissioner of Social Security,              AND
                                             ORDER

                         Defendant.

--------------------------------------------------------------x

P. KEVIN CASTEL, U.S.D.J.

            Plaintiff, Pedro Arteaga, brings this action, pursuant to 42 U.S.C. § 405 (g),

seeking judicial review of the final decision of the Commissioner of Social Security (the

"Commissioner"),[1] denying plaintiff's application for disability insurance benefits and

Supplemental Security Income ("SSI") under Titles II and XVI respectively of the Social

Security Act, 42 U.S.C. § 401 et seq. (the "Act").  Plaintiff maintains that the decision of the

Administrative Law Judge ("ALJ") was not supported by substantial evidence and based on

errors of law. (Compl. ¶ 13)  Pursuant to Rule 12(c), Fed. R. Civ. P., both plaintiff and

defendant have moved for judgment on the pleadings.  For the reasons set forth below,

Defendant's motion is granted.

I.     PROCEDURAL HISTORY

            On September 16, 2002, plaintiff applied to the Social Security Administration

("SSA") for disability insurance benefits and SSI benefits. (R. 94-97, 246-60)  The SSA

---

[1]  Pursuant to Fed. R. Civ. P. 25(d)(1), Michael J. Astrue, who succeeded Jo Anne B. Barnhart as the
    Commissioner of Social Security on February 12, 2007, is substituted as the named defendant.

denied the applications on December 19, 2002. (R. 84-88)  On February 3, 2003, plaintiff

timely requested a hearing before an ALJ. (R. 89)  Plaintiff, assisted by a non-attorney

representative, appeared at the hearing held before ALJ Marilyn Hoppenfeld on September

16, 2004. (R. 11, 262)  After considering all of the testimony at the hearing and evidence

before her, on September 14, 2005, ALJ Hoppenfeld issued a twelve-page decision denying

plaintiff's claim for benefits. (R. 8-22)

On October 26, 2005, plaintiff requested that the Appeals Council review the

ALJ's decision.  (R. 6)  Plaintiff's request for a review was denied in a decision dated

December 14, 2005, thus making the ALJ's decision the final decision of the Commissioner.

(R. 3)  Plaintiff, represented by counsel, subsequently filed a timely complaint in this District

on February 16, 2006.[2]  On October 5, 2006, the Commissioner moved for judgment on the

pleadings which plaintiff has opposed.

II.      EVIDENCE BEFORE THE ALJ

Plaintiff was the sole witness at the hearing held before ALJ Hoppenfeld on

September 16, 2004. (R. 264-354)  An orthopedist had been scheduled to testify but cancelled

due to it being a holiday. (R. 264)  Plaintiff testified as to his physical condition and knee

troubles, his work history, his lengthy treatment for alcohol dependency and morbid obesity

as well as the breakup of his marriage.  In addition to plaintiff's testimony, the ALJ reviewed

a psychiatric report on plaintiff from a consultation which occurred post-hearing as well as

records from nutritional, orthopedic and psychiatric clinics plaintiff had attended at the

Veterans' Administration. (R. 11)

---

[2]  Under the Act, a plaintiff must bring the civil action within sixty days of receiving notice of the Appeals
Council decision, which is assumed to be five days after the date on the notice unless proven otherwise. 42
U.S.C. § 405(g); 20 C.F.R. § 422.210(c).

A.      <u>Non-Medical Evidence</u>

Plaintiff was born on February 11, 1961 in the state of Washington. (R. 271, 273)  The record shows that plaintiff completed high school and attended college for two years. (R. 109)  According to plaintiff's testimony, from 1975 to 1979, plaintiff worked for a school district as an assistant janitor and also worked at a hardware store. (R. 281)  In 1983, plaintiff joined the Navy and served for four years before being honorably discharged. (R. 278-79)  Following his service in the Navy, plaintiff testified that he worked for six or seven months at a PVC plastic pipe company in Washington. (R. 282-84)  Plaintiff testified that while employed by the PVC plastic pipe company, the heaviest object that he would have had to lift would have been eighty pounds. (R. 284)  Plaintiff next worked as the plant foreman for a seed company, a job that lasted almost three seasons. (R. 286-90)  While he was working for the seed company, plaintiff was also the manager of an apartment complex. (R. 290-91)  His duties as manager of the complex consisted of maintenance, plumbing, hardware, mowing, and minor electrical work. (<u>Id.</u>)  In 1991, plaintiff moved to California where he worked as an assistant manager of an auto parts store. (R. 293)  In his position as assistant manager, plaintiff ordered the stock, maintained the inventory, and was responsible for the hiring and scheduling of other workers. (<u>Id.</u>)  Because he and his wife separated in 1993, plaintiff moved back to Washington where he obtained a job as an assistant manager of an appliance rental store. (R. 295, 299)  In March of 1995, he went back to school for a computer training program which he completed in April of 1996. (R.109, 296)  Plaintiff then went back to California where he worked for various auto parts stores until 2001, performing tasks that

required him to lift at most ten pounds.[3] (R. 299-303)  In February 2002, plaintiff moved from California to New York in the hopes of obtaining a position as an administrative assistant at an accounting firm. (R. 122)  However, plaintiff was unable to obtain the position. (Id.)

After the job in New York fell through, plaintiff was homeless and living on the street for approximately one week. (R. 318)  Plaintiff testified that he then went to Bellevue Hospital where he was referred to a homeless shelter. (R. 319)  He spent two months at a homeless shelter before moving into Borden Avenue, a shelter for veterans. (R. 319-20)

In his applications for disability insurance benefits and Supplemental Security Income, plaintiff alleges that he is unable to work due to bilateral knee degenerative joint disease, morbid obesity, and anemia.  (R. 94, 246)  At the hearing before the ALJ, plaintiff testified that he was first hospitalized in 1978 as a result of a football injury to his leg. (R. 304-05)  His family could not afford surgery but the injury was not considered major. (R. 305)  In 1994, plaintiff had arthroscopic surgery on his left knee. (R. 306-08)  Following the surgery, plaintiff still experienced pain in both of his knees. (R. 310)  Plaintiff testified that he refused to take prescription pain medication because of potential side effects and because the medication would "put [him] to sleep". (R. 310-13)  Instead, plaintiff self-medicated the pain by drinking five to six pitchers of beer a night.  (R. 310-11)  He testified that he had been taking eight to twelve Tylenol a day until he realized that he should not be taking it with the alcohol that he was consuming. (R. 314-15)

In March of 2002, plaintiff began getting treated at the Bronx Veterans Administration Medical Center ("Bronx VA"). (R. 308)  Plaintiff testified that while at the Bronx VA, he saw a nutritionist and an orthopedist. (R. 320-22)  He also testified that a

---

[3]  Plaintiff testified that he had worked until August 2001. (R. 316) However, a "Disability Report Form" and an "Activities of Daily Living Form," both from September 2002, indicate that plaintiff worked until August 2002. (R. 104, 117)

psychiatrist had been assigned to him but that he had not gone to her for treatment. (R. 322)
Around the same time, plaintiff entered into an alcohol rehabilitation program despite the fact
that he had not had a drink since August 19, 2001. (R. 309)  He testified at the hearing that he
has continued to go to meetings of Alcoholics Anonymous. (R. 324)

Plaintiff testified that around the time he began to receive treatment, he could
walk about four blocks before he felt pain in his knees. (R. 328)  He told the ALJ that he
could only stand for one or two minutes before experiencing extreme pain and that he does
not put any weight on his left leg. (R. 330-31)  Plaintiff stated that due to his inability to bend
his left knee, his "greatest difficulty" was ascending stairs and that he was unable to kneel. (R.
331)  Plaintiff testified that while sitting his knee becomes stiff within ten minutes. (R. 331)
On two separate occasions during the hearing, plaintiff requested that he be allowed to stand.
(R. 316, 348)  He stated that he is able to carry ten pounds with his arms but he is unable to
pick the same weight up from the ground. (R. 331-32)  Plaintiff testified that he was issued an
elbow cane in July of 2003 by the orthopedics department at the Bronx VA. (R. 328-29)  He
also testified that he has a brace for his left knee, but that it was being repaired. (R. 329)

Plaintiff explained that he had noticed that he was experiencing a loss of
memory. (R. 339)  He stated that during the three or four months prior to the hearing, he was
having difficulty concentrating and could not finish reading a magazine. (R. 343)  However,
he said that approximately five or six months before the hearing, he was able to read a 564-
page "tech manual" in three hours. (R. 346-47)

At the time of the hearing before the ALJ, plaintiff stated that he was living in
a Single Room Occupancy facility ("SRO") for Veterans. (R. 270)  Plaintiff's typical day

consists of waking up between 5:30 and 7:00 a.m., dressing himself, going to any doctor's appointments or reading and watching television. and dresses himself. (R. 343-45)

      B.    <u>Medical Evidence</u>

           1.    <u>Evidence Before Alleged Onset of Disability</u>

On April 4, 2002, plaintiff met with a social worker at the Bronx VA. (R. 122-23)  Plaintiff complained about depression due to living in a shelter and his lack of a job. (<u>Id.</u>)  He explained that when he did have a job, he medicated the pain in his knees by drinking five to six pitchers of beer a day. (<u>Id.</u>)  The social worker noted that plaintiff did not want to take pills for pain management and that plaintiff expected that he would resume drinking once he began to work again. (<u>Id.</u>)  Plaintiff requested help for his alcohol dependence. (<u>Id.</u>)

William Davis, Ph.D., a psychologist, saw plaintiff on April 5, 2002 in regards to treatment for alcohol dependency. (R. 124)  Dr. Davis noted that plaintiff tested positive for an alcohol problem. (<u>Id.</u>)  Plaintiff was referred to an alcohol treatment program but refused the referral. (<u>Id.</u>)

On April 12, 2002, Dr. Yelena Ponomarenko, plaintiff's primary physician, examined plaintiff at the Bronx VA. (R. 125, 323)  At the time of the examination, plaintiff weighed 402 pounds. (R. 125-26)  Plaintiff complained of chronic pain in both knees. (<u>Id.</u>)  Plaintiff explained to Dr. Ponomarenko that he had been obese since 1994 after a surgical procedure on his left knee. (<u>Id.</u>)  He denied having any psychiatric history or depression. (<u>Id.</u>)  Plaintiff indicated that he had been drinking heavily since 1994; however, he had only consumed one drink during the past eight months. (<u>Id.</u>)  Dr. Ponomarenko stressed sobriety to plaintiff and discussed with him the medical consequences of drinking. (<u>Id.</u>)  Dr. Ponomarenko observed that there was no edema in plaintiff's extremities and that his left leg

had a decreased range of motion. (Id.)  The physician referred plaintiff to a nutritionist and stressed a low calorie diet, weight loss, and exercise. (R. 125)  Dr. Ponomarenko noted that plaintiff could engage in regular moderate physical activity for at least thirty minutes, three times a week. (Id.)  Plaintiff was also referred to an endocrinologist and an orthopedist. (Id.)

An April 18, 2002 report written by Dr. Villanueva, an endocrinologist at the Bronx VA, indicated that plaintiff weighed was 396.4 pounds. (R. 127-28)  At the time, his blood pressure was 118/70, which the doctor noted was "ok." (Id.)  Plaintiff and the doctor discussed bariatric surgery and weight loss pills. (Id.)  Plaintiff was advised to stop drinking beer and was referred for a nutritional consultation. (Id.)

On April 26, 2002, plaintiff saw Frank Lee, M.D., for a toxicology evaluation. (R. 129-30)  Dr. Lee observed that plaintiff was morbidly obese and noted that plaintiff minimized issues of drinking, family problems, and employment. (Id.)  Plaintiff's speech was normal and goal directed. (Id.)  Dr. Lee wrote that plaintiff was inappropriately bright and cheery and that plaintiff's insight and judgment were poor. (Id.)  Plaintiff indicated that he had been advised to seek treatment for his knee pain other than alcohol. (Id.)  Plaintiff explained that he used alcohol to alleviate the pain because prescribed medications made him tired whereas alcohol did not. (Id.)  Plaintiff stated that his sleep and mood were good. (Id.) Dr. Lee's diagnosis was: Axis I – alcohol abuse; Axis II – histrionic and narcissistic traits; Axis III – morbid obesity and chronic knee pain; Axis IV – limited financial and social support; and Axis V – "50". (Id.)  Dr. Lee noted that plaintiff needed "confrontive style supportive psychotherapy." (Id.)

Plaintiff saw Dr. Ponomarenko for a regular appointment on May 21, 2002. (R. 132)  At the time of the appointment plaintiff weighed 388 pounds and had a blood pressure

of 114/64.  (Id.)  Plaintiff stated that he had not consumed any alcohol since his previous visit.

(Id.)  Plaintiff again denied any depression or psychiatric history. (Id.)  Dr. Ponomarenko

observed that plaintiff's extremities had no "edema" and that his left knee had a decreased

range of motion. (Id.)  A note from a previous visit in April indicated that an x-ray revealed

degenerative joint disease in plaintiff's left knee. (Id.)  Dr. Ponomarenko again stressed

sobriety, a low calorie diet, weight loss, and exercise. (Id.)

On June 12, 2002, plaintiff was examined by a physical therapist for an

evaluation. (R. 134)  An x-ray of plaintiff's left knee showed degenerative changes, "more

severe at the medial tibiofemoral compartment and patellofemoral compartments." (Id.)  The

therapist diagnosed possible degenerative joint disease in plaintiff's knees. (Id.)  During the

examination plaintiff experienced moderate pain when his knee was flexed to one hundred

degrees.  (Id.)  Plaintiff walked with a stiff left knee during a "gait analysis." (Id.)  The

physician noted that because plaintiff's knee was structurally intact and he had been

prescribed Celebrex, they would wait to see whether the medication alleviated his pain. (Id.)

Plaintiff inquired about the benefits of a custom knee brace but declined to use a cane. (Id.)

On June 13, 2002, plaintiff saw an endocrinologist who noted that plaintiff had

lost thirteen pounds since his last visit. (R. 135)  Plaintiff's weight was recorded at 383

pounds and his blood pressure was 118/70. (Id.)  Plaintiff also indicated that he was willing to

try various weight loss medications and the doctor prescribed Sibutramine and Xenical. (Id.)

2.    Evidence After Alleged Onset of Disability

On August 12, 2002, Dr. Ponomarenko examined plaintiff. (R. 237-38)

Plaintiff maintained that he had not consumed alcohol since his previous visit. (Id.)  At the

time of the appointment, plaintiff weighed 373 pounds and had a blood pressure of 122/70.

(Id.)  Dr. Ponomarenko noted that plaintiff's extremities had no "edema" and that his left knee had a decreased range of motion. (Id.)  The doctor noted that although plaintiff had been prescribed Celebrex by an orthopedist, it did not help his pain. (Id.)  Dr. Ponomarenko again stressed the importance of sobriety, a low calorie diet, weight loss, and exercise. (Id.)

That same day, plaintiff was examined by an orthopedist. (R. 236-37)  Dr. Frelinghuysen noted that plaintiff complained of pain in his left knee while going up and down stairs and indicated that his right knee was "not bothering him much right now." (Id.)  An x-ray of plaintiff's right knee revealed mild osteoarthritis. (Id.)  Plaintiff's right knee had a range of motion of 0-100 degrees but was "limited mechanically at extreme of flexion." (Id.)  The range of motion for plaintiff's left knee was 0-80 degrees, limited by pain and flesh. (Id.)  Dr. Frelinghuysen noted that there was no "crepitance" in the left knee. (Id.)  Dr. Frelinghuysen's assessment was that plaintiff was an obese male with early osteoarthritis. (Id.)  Dr. Frelinghuysen prescribed Naprosyn, discontinued Celebrex, and urged plaintiff to continue with weight loss and conditioning. (Id.)

An addendum to plaintiff's initial physical therapy evaluation dated August 12, 2002 shows that plaintiff indicated that he experienced the most pain while using stairs.  (R. 134)  He described this pain as a nine out of ten on a ten-point scale. (Id.)  Plaintiff also explained that he felt pain rated as a nine out of ten while sitting and that lying on his back with his knee flexed and supported eliminates the pain. (Id.)  The physical therapist wrote that plaintiff had decreased right leg stability and could maintain a single right leg stance for five seconds. (Id.)  Plaintiff could hold a single left leg stance for more than thirty seconds without "perturbation" around his left ankle. (Id.)

On August 19, 2002, plaintiff asked Dr. Ponomarenko to fill out a memorandum in connection with obtaining welfare benefits.  (R. 236)  Dr. Ponomarenko noted that plaintiff had no complaints during this walk-in visit. (Id.)  There was no "edema" in plaintiff's extremities and his blood pressure was 160/82. (Id.)

Plaintiff attended physical therapy sessions on August 26, 2002, August 28, 2002, and September 4, 2002. (R. 137-39)  At the August 26, 2002 session, plaintiff reported that he experienced constant right knee pain at a level of eight out of ten. (Id.)  At the August 28, 2002 and September 4, 2002 sessions, plaintiff indicated that he was feeling better but had been experiencing increased tightness in his posterior knee. (Id.)  At all three of the physical therapy sessions, plaintiff tolerated the treatment well and had no adverse reactions to it. (Id.)  The physical therapist present at the September 4, 2002 session recorded that the session had been cut short because plaintiff had to leave for work. (Id.)

Lavonna Branker, M.D., examined plaintiff on September 3, 2002. (R. 146-48)  Dr. Branker noted that plaintiff had traveled to the appointment unaccompanied by subway. (R. 146)  Dr. Branker noted that at the time plaintiff was working as a computer trainer. (Id.)  Plaintiff's daily activities included watching television, reading, doing household chores, buying groceries, and going to work. (R. 147)  Dr. Branker wrote that plaintiff complained of knee pain that was worse with prolonged walking, climbing stairs, and humid weather. (R. 147)  The report shows that plaintiff was taking Celebrex at the time of the examination and that the medication gave him partial relief. (R. 146)  Dr. Branker also noted that plaintiff was not using a support brace at the time. (Id.)  Approximately three months before the examination, plaintiff was found to have mild anemia. (Id.)

At the time of Dr. Branker's examination, plaintiff was five feet nine and a quarter inches tall, weighed more than 350 pounds, and had a blood pressure of 100/70. (R. 147)  Plaintiff's extremities showed no "clubbing, cyanosis, ulceration or edema." (Id.)  Dr. Branker observed that the plaintiff walked without assistance and that his "gait was antalgic." (Id.)  Dr. Branker further observed that plaintiff had difficulty getting on an off of the examination table. (Id.)  All of plaintiff's joints had a full range of motion except for his left and right knees, which had a range of motion in flexion extension of 0-90 and 0-100 respectively. (Id.)  Dr. Branker noted that plaintiff had "bilateral knee crepitus with mild suprapatellar swelling of his left knee." (Id.)  An x-ray of plaintiff's right knee revealed minor degenerative changes. (Id.)  Dr. Branker found that the plaintiff's spine had a normal range of motion and that it had no tenderness or deformity. (Id.)

After examining plaintiff, Dr. Branker diagnosed bilateral knee degenerative joint disease with mild decreased range of motion in plaintiff's right knee. (Id.)  Dr. Branker further diagnosed morbid obesity and anemia by history that was stable and reversed. (R. 147-48)  As to plaintiff's ability to perform work-related activities, Dr. Branker wrote that plaintiff was able to walk, sit, stand, lift, carry, handle objects, hear speak and travel. (R. 148)  Dr. Branker further noted that plaintiff was significantly limited by morbid obesity that caused pain and limitation in two weight bearing joints. (Id.)  Dr. Branker's prognosis was fair to guarded and plaintiff was referred for SSI application. (Id.)

Plaintiff saw Dr. Ponomarenko for a regular appointment on September 20, 2002. (R. 141-42)  Plaintiff complained that Naprosyn was not alleviating his knee pain. (Id.)  At the time of the appointment, plaintiff weighed 351 pounds and his blood pressure was 128/76. (Id.)  Dr. Ponomarenko observed that there was no "edema" in plaintiff's extremities

and that his left knee had a decreased range of motion. (Id.)  Plaintiff then had an x-ray of his left knee taken on September 23, 2002 which showed a "narrowing of the medial joint space with marginal spurring in both joint compartments" and "degenerative changes of the patellofemoral joint." (R. 175-76)  The impression of the examining physician was degenerative arthritis. (Id.)

A note from a September 27, 2002 visit to Dr. Villanueva indicated that plaintiff weighed 355 pounds, a loss of 28 pounds since his previous visit. (R. 143)  Dr. Villanueva noted that plaintiff's peak weight was 484 pounds. (Id.)  At the time of the appointment, plaintiff's blood pressure was 116/68. (Id.)  Dr. Villanueva observed that plaintiff had "lost a lot of weight," but the weight loss had tapered off. (Id.)  Dr. Villanueva noted that he would re-request Orlistat and refer plaintiff to a surgeon to have plaintiff evaluated for possible weight loss surgery. (Id.)

Plaintiff saw a nutritionist on September 27, 2002.  (R. 231-33)  Records from the appointment indicate that plaintiff had reduced his portion sizes and had lost weight. (Id.) The nutritionist wrote that plaintiff's weight was "well above" the ideal body weight ("IBW") and that his body mass index ("BMI") indicated morbid obesity. (Id.)  The nutritionist further noted that plaintiff had a good understanding of portion control and that he was enthusiastic about further weight loss. (Id.)  Plaintiff was encouraged to continue to consume healthy foods and maintain his current diet. (Id.)

On September 30, 2002, an orthopedist, Dr. Simic, examined plaintiff. (R. 144) Dr. Simic recorded that plaintiff was able to flex his left knee from 0-80 degrees but it was limited by pain and flesh. (Id.)  Dr. Simic further noted that the left knee had no instability, "crepitance," or "jlt". (Id.)  An x-ray of plaintiff's left knee showed osteoarthritis in the

medial compartment. (Id.)  Dr. Simic's assessment was that plaintiff was an obese male with early left knee osteoarthritis. (Id.)  He recommended that plaintiff continue to take Naprosyn and prescribed plaintiff an uploader knee brace, which was delivered to plaintiff on November 27, 2002. (R. 144, 219)

On November 20, 2002, plaintiff visited Dr. Ponomarenko and complained of pain and numbness that he had been experiencing in his right leg since November 15, 2002. (R. 220)  Plaintiff indicated that the pain, which suddenly started at night, is exacerbated by sitting and partially relieved by walking. (Id.)  At the time, plaintiff weighed 360.5 pounds and had a blood pressure of 125/75. (Id.)  Dr. Ponomarenko noted that plaintiff's extremities had no "edema" and that his left knee had a decreased range of motion. (Id.)  Dr. Ponomarenko opined that plaintiff's right leg pain was probably secondary to lumbar spine arthritis. (Id.)  An x-ray of plaintiff's lumbar spine taken on the same day was normal except for a "small spur at anterior vertebral bodies." (R. 175)

On November 29, 2002, S. Lason, a disability analyst, completed a Physicial Residual Functional Capacity Assessment form. (R. 165-72)  The analyst determined that plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently. (R. 166)  Furthermore, the analyst opined that with normal breaks, plaintiff could stand or walk for at least two hours and sit for about six hours in an eight-hour workday. (Id.)  The analyst noted that plaintiff was able to walk without assistive devices and that he could use public transportation unaccompanied. (R. 169)  The analyst determined that plaintiff would be limited in his ability to perform frequent stair climbing, prolonged walking, and standing in excess of two hours. (R. 171)  The analyst concluded that plaintiff could perform the full range of sedentary work. (Id.)

Dr. Ponomarenko examined plaintiff on December 20, 2002. (R. 216)  She noted that plaintiff's left knee pain had improved with the use of his knee brace and that he was using crutches to walk. (Id.)  At the time of the appointment, plaintiff weighed 363 pounds and had a blood pressure of 130/80. (Id.)  An examination of plaintiff's extremities showed no "edema." (Id.)  Dr. Ponomarenko noted that plaintiff's left knee had a lateral abrasion that was healing. (Id.)  Dr. Ponomarenko diagnosed morbid obesity, bilateral knee pain secondary to degenerative joint disease, alcohol abuse in remission, and persistent "leucocytouria." (Id.)

Plaintiff was also examined by Dr. Villanueva on December 20, 2002. (R. 214) Dr. Villanueva noted that plaintiff had gained weight due to the holidays and that he had yet to receive the Orlistat that had been requested after his last appointment. (Id.)  At the time of the appointment, plaintiff weighed 363 pounds and had a blood pressure of 138/70. (R. 215) Dr. Villanueva evaluated plaintiff for erectile dysfunction and found that his testosterone was normal. (Id.)  On the same day, plaintiff was given a depression screening evaluation that turned out negative. (R. 216)

On December 23, 2002, plaintiff was examined by Dr. Goldstein, a resident physician at the Bronx VA, for complaints of "paeresthesias" in the left leg. (R. 213)  Dr. Goldstein noted that plaintiff was on a weight reduction program, had lost 134 pounds, and was wearing a knee brace on his left knee. (Id.)  Plaintiff denied any pain or weakness and was not taking any pain medication. (Id.)  On a pain intensity scale of one through five, plaintiff rated his pain a zero. (Id.)  Plaintiff had a strength level of five out of five in both lower extremities. (Id.)  Dr. Goldstein observed that plaintiff walked without difficulty using a "Lofstrand cane" and that there was only minor weight bearing on the cane. (Id.)  Dr.

Goldstein's impression of plaintiff was neuropathy of unknown etiology. (Id.)  Dr. Goldstein

recommended a two-month treatment plan consisting of kinesiotherapy ("KT"), pool therapy,

and a home exercise program. (R. 213-14) Plaintiff was eventually discharged from

kinesiotherapy as a result of numerous no-show appointments. (R. 208)

An "Employability Report" completed some time in 2002 by plaintiff's

treating physician, Dr. Ponomarenko, showed that she diagnosed morbid obesity and

osteoarthritis of the knees both of which had a date of onset of 1994. (R. 145)  She also

diagnosed erectile dysfunction, mild anemia, and "ETOH LD." (Id.)  Dr. Ponomarenko also

noted that plaintiff had tried Celebrex for his osteoarthritis but it had failed to alleviate the

pain. (Id.)  She also wrote that an x-ray taken in April of 2002 revealed degenerative joint

disease in the left knee that was "more severe at the medial tibiofemoral compartment and

patellofemoral compartment." (Id.)  She wrote that plaintiff was unable to perform a job that

included prolonged standing or excessive walking, especially up and down stairs. (Id.)  She

indicated that the type of job that plaintiff could perform is "office work." (Id.)

Dr. Ponomarenko examined plaintiff on February 11, 2003 for a regular

appointment. (R. 208)  Plaintiff again indicated that Naprosyn was not relieving the pain in

his left knee; however, the knee brace helped to improve the pain. (Id.)  Dr. Ponomarenko

observed that plaintiff was still using crutches to walk. (Id.)  Plaintiff weighed 371 pounds, a

gain of eight pounds since his previous visit, and had a blood pressure of 130/74. (Id.)  An

examination of plaintiff's extremities showed no "edema." (Id.)  Dr. Ponomarenko's

impression of plaintiff was: alcohol abuse in remission, morbid obesity, bilateral knee pain

secondary to degenerative joint disease, persistent "leucocytouria," erectile dysfunction

improved with Viagra, and mild anemia that had been resolved. (R. 208-09)  An addendum to

Dr. Ponomarenko's report indicated that plaintiff was experiencing a pain level of seven on a ten-point scale, which was acceptable to plaintiff. (R. 209)

A note dated February 28, 2003 reveals that plaintiff completed a "CWT" program that he began on August 19, 2002. (R. 206)  In this program, plaintiff was assigned to a computer lab as a lab technician. (Id.)  He did this five days per week from 8:30 a.m. until 4:00 p.m. (Id.)  As part of the CWT program, plaintiff attended weekly group therapy sessions, took weekly "u-toxes," and saw his case manager on a monthly basis. (Id.)  Plaintiff was described as an "outstanding worker." (Id.)  The note indicates that plaintiff had been unable to obtain employment due to medical problems and that he had been referred to a job placement specialist. (Id.)

Plaintiff visited Dr. Ponomarenko for a regular appointment on May 12, 2004. (R. 201-02)  Dr. Ponomarenko noted that plaintiff had a blood pressure of 120/84 and had gained 53 pounds since his last visit. (Id.)  Plaintiff was still using crutches to walk and his knee pain was improved through the use of a brace. (Id.)  An examination of plaintiff's extremities showed no "edema." (Id.)  Plaintiff had a pain level of eight out of ten and the pain control was acceptable to him. (Id.)  Dr. Ponomarenko's diagnosis was alcohol abuse in remission, morbid obesity, bilateral knee pain secondary to degenerative joint disease, persistent "leucocytouria," and erectile dysfunction improved with Viagra. (Id.)  Dr. Ponomarenko indicated that plaintiff had been gaining weight and although he had seen a nutritionist in the past, he failed to follow the diet. (Id.)  She discussed the medical consequences of obesity with plaintiff and stressed the importance of weight loss. (Id.)  A note from a nurse dated the same day indicates that plaintiff tried to eat a healthy diet low in

fat and that he walked and worked out on a health rider exercise machine. (R. 204)  The note further shows that plaintiff had another depression screening which was negative. (Id.)

On June 4, 2004 plaintiff visited Dr. Villanueva. (R. 199-200)  Plaintiff indicated that he was gaining weight and that he wanted to try Orlistat again before considering bariatric surgery. (Id.)  Plaintiff also stated that he did not have an increased appetite and did not "binge eat." (Id.)  At the time of the appointment, plaintiff had a blood pressure of 101/55 and weighed 424 pounds. (Id.)  Dr. Villanueva's diagnosis was morbid obesity. (Id.)  Plaintiff was given a trial of Orlistat and referred to a nutritionist. (Id.)

On July 27, 2004, plaintiff had a consultation with a dietician. (R. 197-99)  The dietician's notes showed that plaintiff had a good appetite, did not exercise, was not following any specific diet recommendations, and weighed 415 pounds. (Id.)  The dietician opined that plaintiff's weight indicated extreme obesity and that he was a high risk for Cardiovascular Disease ("CVD"). (Id.)  She recommended that plaintiff reduce his portions and eat three meals a day to prevent overeating during the following meal. (Id.)

Dr. Ponomarenko examined plaintiff on August 27, 2004. (R. 195-96)  Plaintiff indicated that he had not consumed alcohol in three years. (Id.)   Plaintiff weighed 415 pounds and his blood pressure was 146/82. (Id.)  An examination of plaintiff's extremities showed no signs of "edema." (Id.)  Dr. Ponomarenko wrote that even though she encouraged him not to eat junk food, plaintiff continued to do so. (Id.)  Plaintiff had a pain level of an eight out of ten, which was tolerable according to plaintiff and he refused to take pain medication. (Id.)  Her diagnosis was alcohol abuse in remission, morbid obesity, bilateral knee pain secondary to degenerative joint disease, persistent "leucocytouria," erectile

dysfunction, elevated blood pressure, and insomnia. (Id.)  Dr. Ponomarenko stressed need for weight loss, exercise, and a low-salt diet. (Id.)

On November 23, 2004, Dr. Ponomarenko again examined plaintiff. (R. 194-95)  Plaintiff indicated that his insomnia was only partially relieved by Benadryl. (Id.)  Dr. Ponomarenko noted that plaintiff weighed 389 pounds, a loss of twenty-six pounds since his previous appointment. (Id.)  Plaintiff's blood pressure was 130/74. (Id.)  An examination of plaintiff's extremities revealed tiny varicose veins and no "edema." (Id.)  A pain evaluation determined that plaintiff had a pain level of nine out of ten, which was acceptable to plaintiff. (Id.)  Dr. Ponomarenko diagnosed alcohol abuse in remission, morbid obesity, bilateral knee pain secondary to degenerative joint disease, persistent "leucocytouria," erectile dysfunction, and insomnia. (Id.)

On January 20, 2005, after the hearing before the ALJ, H. Meadow, M.D. conducted a psychiatric evaluation of plaintiff. (R. 240-45)  Dr. Meadow noted that plaintiff arrived on his own via public transportation. (R. 240)  Plaintiff explained that he had last worked in 2000 as an assistant manager of an auto parts store but he had been laid off because the employer feared that it would have to pay insurance claims related to plaintiff's leg problems. (Id.)  Plaintiff explained that at the time he was living in an SRO. (Id.)  He indicated that his daily activities included using a computer, listening to the radio, watching television, reading, talking to acquaintances, taking care of his personal hygiene, and doing light chores around his room. (R. 241)  Plaintiff indicated that he had no psychiatric history except for psychotherapy in conjunction with  a rehabilitation program two years before Dr. Meadow's evaluation. (R. 240)  Plaintiff stated that the only medication that he was taking at the time was Acetaminophen and Trazodone. (Id.)  At the time plaintiff weighed in the "mid-

300's" and he stated that he had lost one hundred pounds in the six months leading up to the psychiatric evaluation. (Id.) Plaintiff explained that he had been feeling depressed, sometimes cried for no apparent reason, had been having difficulty concentrating, and that his appetite had decreased substantially. (Id.) Dr. Meadow noted that plaintiff had described increased levels of anxiety and that plaintiff had been having trouble sleeping. (Id.)

Dr. Meadow observed that plaintiff walked with a crutch and had a "moderate to severe limp." (R. 241) Plaintiff speech was coherent and goal directed. (Id.) Dr. Meadow observed that no thought disorder was evident and that plaintiff's mood was depressed. (Id.) Plaintiff's insight and judgment were unimpaired. (Id.) Dr. Meadow determined plaintiff's intelligence to be in the average range. (Id.) Dr. Meadow wrote that his findings were consistent with plaintiff's allegations, and although plaintiff displayed symptoms of a psychiatric disorder, "it would not necessarily interfere with his ability to function." (Id.) Dr. Meadow's diagnosis was: Axis I – alcohol dependence in remission and moderate dysthymia. (Id.) Dr. Meadow opined that psychiatric treatment for plaintiff would be helpful. (Id.)

On February 4, 2005, plaintiff, complaining of generalized itching and a rash on his bilateral upper extremities, went to Dr. Ponomarenko for an unscheduled visit. (R. 190-91) Plaintiff weighed 389 pounds and his blood pressure was 126/86. (R. 190) Dr. Ponomarenko again diagnosed alcohol abuse in remission, morbid obesity, bilateral knee pain secondary to degenerative joint disease, persistent "leucocytouria," erectile dysfunction, and insomnia. (R. 190-91) A brief pain evaluation revealed that plaintiff's pain level was rated nine out of ten. (R. 191) Dr. Ponomarenko prescribed Ambien for plaintiff's insomnia and Benadryl for the rash. (Id.)

III.   APPLICABLE LAW

A.      Disability Determination

In order for a claimant to be considered disabled under the Act, he or she must prove

an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. § 423(d)(1)(A).  A claimant's impairment must be "of such severity that he is not only

unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national

economy." 42 U.S.C. § 423(d)(2)(A); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

Furthermore, "'work which exists in the national economy' means work which exists in

significant numbers either in the region where such individual lives or in several regions of

the country." 42 U.S.C. § 423(d)(2)(A).  A claimant's impairment must be supported by

evidence gathered by medically acceptable clinical and laboratory diagnostic techniques. 42

U.S.C. § 423(d)(3); see, e.g., Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998).  A claimant

is permitted to demonstrate his or her disability through a combination of impairments and the

Commissioner "must evaluate their combined impact on a claimant's ability to work,

regardless of whether every impairment is severe." 42 U.S.C. § 423(d)(2)(B); Dixon v.

Shalala, 54 F.3d 1019, 1031 (2d Cir. 1995).  In evaluating a disability claim, the

Commissioner is required to apply a five-step sequential analysis promulgated by the SSA.

The Second Circuit has described this process as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged
> in substantial gainful activity.  If he is not, the [Commissioner] next considers
> whether the claimant has a "severe impairment" which significantly limits his
> physical or mental ability to do basic work activities.  If the claimant suffers

such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa, 168 F.3d at 77. (citations omitted).

The claimant bears the burden of proof for steps one through four of the analysis. DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998).  If at any of the first four steps the Commissioner finds that the claimant is disabled (or not disabled), the Commissioner is not required to proceed further with the analysis. See Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 1999) (citing 20 C.F.R. § 404.1520(a)).  If, however, the analysis reaches the fifth step, the burden shifts to the Commissioner to "show there is other gainful work in the national economy which the claimant could perform." Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002) (citing Carroll v. Secretary of Health and Human Services, 705 F.2d 638, 642 (2d Cir. 1983)).  In making a determination through this analysis, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

B.      Standard of Review

Under Rule 12(c) of the Federal Rules of Civil Procedure, "judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." Sellers v. M.C. Floor

Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988).  The motion will be granted only if the

moving party establishes "that no material issue of fact remains to be resolved and that it is

entitled to judgment as a matter of law." Juster Assocs. v. City of Rutland, 901 F.2d 266, 269

(2d Cir. 1990) (citation omitted).

      The Court is not permitted to determine whether the plaintiff is disabled de

novo. Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Parker v. Harris, 626 F.2d 225, 231

(2d Cir. 1991).  Instead, the final determination of the Commissioner must be upheld if it is

supported by substantial evidence and free of legal error. See 42 U.S.C. § 405(g); Shaw v.

Chater, 221 F.3d 126, 131 (2d Cir. 2000).  This Court does not resolve evidentiary conflicts

nor does it appraise the credibility of witnesses, including the claimant, rather those

judgments are reserved for the Commissioner. Carroll, 705 F.2d at 642.

      Substantial evidence is "more than a mere scintilla" and consists of "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Richardson v. Perales, 402 U.S. 389, 401 (1971); accord Halloran v. Barnhart, 362 F.3d 28,

31 (2d Cir. 2004) (per curiam).  Relevant evidence includes inferences and conclusions drawn

from evidentiary facts. Rivas v. Barnhart, 2005 WL 183139, at *18 (S.D.N.Y. Jan. 27, 2005)

(citations omitted).  Accordingly, "[w]here the Commissioner's decision rests on adequate

findings supported by evidence having rational probative force, we will not substitute our

judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

      Legal error includes the misapplication of the five-step sequential analysis or

the failure to properly apply the "treating physician rule." See 20 C.F.R. § 404.1520;

404.1527(d)(2).  The opinion of the claimant's treating physician about the nature and

severity of a claimant's impairments will be given controlling weight when it is "well

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §

404.1527(d)(2); Williams v. Commissioner of Social Security, 2007 WL 1192405, *2 (2d Cir.

2007) (citations omitted).  However, "the opinion of the treating physician is not afforded

controlling weight where . . . the treating physician issued opinions that are not consistent

with other substantial evidence in the record, such as the opinions of other medical experts."

Id.  A lack of specific clinical findings in the treating physician's opinion does not, by itself,

permit the ALJ to discredit the treating physician's report. Clark v. Commissioner of Social

Security, 143 F.3d 115, 118 (2d Cir. 1998).  If the ALJ deems the clinical findings to be

inadequate, it is the ALJ's duty to obtain additional information from the treating physician

sua sponte. Schaal, 134 F.3d at 505.  Even when the claimant is represented by counsel, the

ALJ has an obligation to develop the administrative record. Clark, 143 F.3d at 118.

　　　　　If an ALJ decides not to give controlling weight to the treating physician's

opinion, he or she must apply certain factors to determine what weight to give the opinion. 20

C.F.R. § 404.1527(d)(2).  Such factors are: (1) the frequency of examination and the length,

nature, and extent of the treatment relationship; (2) the evidence in support of the treating

physician's opinion; (3) the opinion's consistency with the entirety of the record; (4) whether

the treating physician is a specialist; and (5) other factors brought to the attention of the SSA

attention that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d)(2)(i-ii) &

(d)(3-6); see also Halloran, 362 F.3d at 32.

IV.    APPLICATION

　　　　　In evaluating plaintiff's claimed disability, ALJ Hoppenfeld applied the

sequential five-step analysis and concluded that plaintiff was not disabled. (R. 12, 20-22)  At

step one, she determined that there was no proof that the claimant had engaged in substantial

gainful activity since the alleged onset of his disability. (R. 21)  In applying the second step of

the analysis, ALJ Hoppenfeld explained that plaintiff's "dysthymia," degenerative

osteoarthritis, history of alcoholism in remission, and history of obesity were considered

severe according to 20 C.F.R. § 404.1520(c). (Id.)  However, the ALJ concluded, under step

three, that the impairments did not "meet or medically equal one of the listed impairments in

Appendix 1, Subpart P, Regulation No. 4." (Id.)  Therefore, the ALJ was required to

determine whether plaintiff had the residual functional capacity to perform his past work. 20

C.F.R. § 404.1520.

　　　　　ALJ Hoppenfeld determined that plaintiff had the residual functional capacity

for a full range of sedentary work.[4]  She explained that plaintiff was able to sit for six hours,

"with regular interval breaks and/or sit or stand at the computer." (Id.)  Furthermore, ALJ

Hoppenfeld concluded that plaintiff was able to stand and walk for two hours and that he

could occasionally lift ten pounds. (Id.)  She also noted that there were no psychiatric or non-

exertional limitations that would prevent a full range of sedentary work. (Id.)  She held that,

while plaintiff had many skills, he would be considered unskilled for the purposes of the

decision. (Id.)  After determining that plaintiff had the capacity for a full range of sedentary

work, she concluded that plaintiff was "unable to perform any of his past relevant work as an

assistant manager, except for that portion that required computer work such as inventory

---

[4]  According to 20 C.F.R. § 404.1567(a), "sedentary work" involves lifting no more than 10 pounds at a time
and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job
is defined as one which involves sitting, a certain amount of walking and standing is often necessary in
carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other
sedentary criteria are met.

control and ordering." (R. 21)  Therefore, ALJ Hoppenfeld was required to determine whether plaintiff could perform other gainful work in the national economy.

ALJ Hoppenfeld proceeded to step five of the analysis, on which the Commissioner bore the burden of proof, and determined that plaintiff was a "younger individual between the ages of 18 and 44," had "more than a high school education," and had the capacity for a full range of sedentary work.  Consequently, the ALJ looked to Rule 201.27 of the Medical-Vocational Guidelines ("Grids") found in 20 C.F.R., Part 404, Subpart P, Appendix 2 which directed a finding of "not disabled." (Id.)

In determining that plaintiff had the residual functional capacity for a full range of sedentary work, ALJ Hoppenfeld considered all of the clinical and objective medical evidence in the record, including that of the plaintiff's treating physician. (R. 15)  She recognized that plaintiff had a severe impairment in both knees. (R. 17)  However, she found that there was no objective evidence in the record that plaintiff was not capable of walking, sitting, and standing. (Id.)  ALJ Hoppenfeld noted that at a June 2002 appointment, Dr. Kim noted that plaintiff's left knee appeared stable, with no signs of ligamentous laxity. (R. 18, 134)  Furthermore, at the same appointment, the doctor said plaintiff's left knee appeared structurally intact and noted that it had a range of motion from 0 to 100 degrees. (Id.)  She noted that Dr. Branker, an independent consultant, determined that plaintiff could walk, sit, stand, lift, carry, handle objects, and travel. (R. 17)  Dr. Branker found that plaintiff had degenerative arthritis that was mild in the right knee and moderate in the left knee. (R. 17-18)  However, ALJ Hoppenfeld concluded that the condition of plaintiff's knees would only restrict exertional activities and would not prevent sedentary work. (Id.)  Although Dr. Branker wrote that "[plaintiff] is referred for SSI application," the ultimate determination of

whether or not a claimant is disabled is reserved for the Commissioner. 20 C.F.R. §
404.1527(e)(1).

ALJ Hoppenfeld's determination that plaintiff has the capacity for a full range
of sedentary work is supported by other evidence in the record.  Plaintiff's treating physician,
Dr. Ponomarenko, completed an employability report for plaintiff and wrote that he was
capable of performing "office work," which is consistent with sedentary work. (R. 145)  She
noted that plaintiff would be limited in performing jobs that require prolonged standing or
excessive walking, neither of which are required by sedentary work. (Id.)  This is significant
given that an ALJ must give a treating physician's opinion controlling weight when it is "well
supported by medically acceptable clinical and laboratory diagnostic techniques and is not
inconsistent with the other substantial evidence in [the] case record." 20 C.F.R.
§ 404.1527(d)(2); Williams, 2007 WL 1192405, at *2. (citations omitted)

ALJ Hoppenfeld also noted that plaintiff was capable of participating in a
"CWT" program at the Bronx VA from August 19, 2002 to February 28, 2003 in which he
worked five days a week from 8:30 a.m. until 4:00 p.m. (R. 18)  After the completion of the
CWT program, plaintiff was described as an "outstanding worker." (Id.)  Furthermore, ALJ
wrote that in September of 2002, plaintiff had indicated on a form that he had stopped working
because he had been "laid off," not because he was disabled or incapable of working. (R. 18)
Thus, she inferred that "the claimant's impairment(s) would not prevent the performance of
that job, since it was being performed adequately at the time of the layoff despite a similar
mental condition." (Id.)

ALJ Hoppenfeld noted that plaintiff did not receive the type of medical
treatment that one would expect a totally disabled person to receive. (R. 19)  For example, the

record shows that there was a fifteen month period in which plaintiff did not receive any medical treatment. (R. 202, 208)  Furthermore, plaintiff's impairments were treated using a cane, crutches, and a brace, which plaintiff stated lessened the pain. (R. 195, 208, 213)

ALJ Hoppenfeld determined that plaintiff had no psychiatric limitations that would interfere with sedentary work. (R. 17)  She referenced a report by Dr. Meadow in which he opined that while plaintiff had a psychiatric diagnosis, it would not necessarily interfere with his ability to function. (R. 16-17, 241)   Plaintiff had no history of psychiatric treatments other than psychotherapy in conjunction with a rehabilitation program. (R. 240)  Plaintiff also had depression screenings that turned out negative. (R. 203, 216)  Furthermore, plaintiff testified that the psychiatrist who was assigned to him did not believe that he needed any psychiatric medication. (R. 322-23)

Plaintiff argues that ALJ Hoppenfeld's decision is not supported by substantial evidence and contains legal errors.  (Memorandum of Law in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings ("Pl. Mem.") at 14).  More specifically, plaintiff contends that "the evidence of record does not support a finding that [plaintiff] can stand or walk for a total of two hours required by sedentary work." (Pl. Mem. at 14).  Plaintiff argues that his "promise" to exercise thirty minutes, three times a week is substantially less than the walking requirements of sedentary work. (Id.)  However, plaintiff neglects to mention that Dr. Ponomarenko, his treating physician, indicated that plaintiff could engage in physical activity for at least thirty minutes three times a week. (R. 126)  Furthermore, plaintiff argues that because he walked with a crutch, had his gait described as antalgic, and walked with a "moderate to severe limp," ALJ Hoppenfeld erred in her determination that plaintiff was capable of sedentary work. (Pl. Mem. at 14-15).  However, the premise of plaintiff's argument

does not lead to the conclusion that he is unable to walk for two hours in an eight-hour workday.

In addition to the clinical and objective medical evidence, ALJ Hoppenfeld considered plaintiff's testimony regarding his alleged pain.  However, she determined that objective medical evidence did not support plaintiff's testimony pertaining to his alleged limitations and that his own activities contradicted his allegations. (R. 21)  A subjective experience of pain can support a finding of disability provided there are "medical signs and laboratory findings which show that [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain." Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999) (quoting 20 C.F.R. §404.1529 (a)).  However, disability "requires more than mere inability to work without pain." Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  Furthermore, for an impairment or impairments to be disabling, "the pain must be so severe…as to preclude any substantial gainful employment." (Id.)

In assessing such complaints of pain, an ALJ considers: (1) the plaintiff's daily activities; (2) the location duration, frequency, and intensity of the plaintiff's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the plaintiff receives or has received for relief of pain or other symptoms; (6) any measures the plaintiff uses or has used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).  An ALJ "has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment [regarding that pain, he must do so] in light of medical findings and other evidence, regarding the true extent of the

pain alleged by the claimant." <u>Mimms v. Secretary of Health and Health Services</u>, 750 F.2d 180, 186 (2d Cir. 1984) (citing <u>McLaughlin v. Secretary of Health, Education and Welfare</u>, 612 F.2d 701, 705 (2d Cir. 1980)).  "If the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." <u>Aponte v. Secretary, Dept. of Health and Human Services</u>, 728 F.2d 588 (2d Cir. 1984) (citing <u>McLaughlin</u>, 612 F.2d at 704).

In determining that plaintiff's subjective symptoms were not credible to the extent that he alleged, ALJ Hoppenfeld correctly assessed plaintiff's allegations in light of the factors in 20 C.F.R. § 404.1529(c)(3).  For example, ALJ Hoppenfeld wrote that even though plaintiff may have had some discomfort and limitation of motion, his doctors felt that pain medication was not necessary and that an anti-inflammatory medication would suffice. (R. 18)  Furthermore, at a November 2002 appointment, plaintiff was advised to take Tylenol. (R. 19)  During a visit in August of 2004, plaintiff refused pain medication and conveyed that the pain was tolerable. (R.19, 196)  A report by Dr. Branker indicated that although plaintiff's gait was antalgic, he walked without assistance. (R. 16)

ALJ Hoppenfeld noted that plaintiff was able to dress himself every day, attend doctor appointments, read, watch television, and listen to music. (R. 15)  Furthermore, she pointed to the 2005 report by Dr. Meadow that showed that plaintiff was able to do light chores and care for his personal needs. (<u>Id.</u>)  She also noted that plaintiff traveled to the hearing via public transportation. (R. 13)  In addition, plaintiff had participated in the "CWT" program in which he worked five days a week from 8:00 a.m. until 4:30 p.m. and was capable of concentrating during the program. (R. 18)  In summary, ALJ Hoppenfeld determined that plaintiff's daily activities were somewhat greater than he had generally reported. (R. 18)

Because there is substantial evidence in the record as a whole to support the ALJ's determination, it must be upheld.  Furthermore, Courts in this District and in other jurisdictions generally act with great deference in evaluating appeals of ALJ determinations of witness or claimant credibility because the ALJ heard the witness testify and observed his or her demeanor. See, e.g., Wier v. Heckler, 734 F.2d 955 (3d Cir. 1984); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995).

Plaintiff alleges and the defendant admits that ALJ Hoppenfeld relied on a Physical Residual Functional Capacity Assessment that was completed by a disability analyst who ALJ Hoppenfeld mistakenly called a "medical consultant." (Pl. Mem. at 16; Defendant's Memorandum of Law in Support of Her Motion for Judgment on the Pleadings ("Def. Mem.") at 20; Tr. 19)  ALJ Hoppenfeld erroneously stated that the disability analyst's finding was entitled to medical weight because his "opinion represents a medical expert's medical opinion by non-examining sources in accordance with Social Security Ruling 96-6p." (Id.)  However, ALJ Hoppenfeld also relied on the opinions of Dr. Branker and Dr. Ponomarenko, plaintiff's treating physician, both of whom provide support for the ALJ's decision. (R. 16-19)  I conclude that ALJ Hoppenfeld's findings that plaintiff is not disabled and could perform the full range of sedentary work is supported by substantial evidence in the record and are free from legal error.

V.    CONCLUSION

For the foregoing reasons, I conclude that the ALJ's determinations were supported by substantial evidence and free from legal error.  Therefore, defendant's motion for judgment on the pleadings is GRANTED.  Plaintiff's motion for judgment on the

pleadings is DENIED.  The Clerk of the Court is directed to enter judgment in favor of the

defendant.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       August 15, 2007